USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #
DATE FILED 7/23/10

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

----------------------------------X

UNDERPINNING & FOUNDATION SKANSKA,
INC.,

                           Plaintiff,

      -against-

TRAVELERS CASUALTY & SURETY CO.
OF AMERICA,

                        Defendant.

----------------------------------X

07 Civ. 7348 (THK)

**MEMORANDUM OPINION
AND ORDER**

**THEODORE H. KATZ, UNITED STATES MAGISTRATE JUDGE.**

      Plaintiff Underpinning & Foundation Skanska, Inc. ("Plaintiff" or "Underpinning") brought this action seeking payment under a Payment Bond issued by Defendant Travelers Casualty & Surety Company of America ("Travelers"), for work performed on a construction project ("the Project"). The parties consented to proceed before this Court for all purposes, pursuant to 28 U.S.C. § 636(c).

      Presently before the Court is Underpinning's motion for partial summary judgment, pursuant to Rule 56 of the Federal Rules of Civil Procedure. Travelers has claimed various set-offs against Underpinning's payment claim, for delays in the Project that were allegedly caused by Underpinning. Underpinning argues in its motion that there is no basis in fact or law for most of Travelers' set-offs. Underpinning therefore claims it is entitled to a reduction in the set-offs, and a minimum payment of $433,654.78, plus interest under the Payment Bond. For the reasons that follow,

Underpinning's motion is granted in part.

## BACKGROUND

This action arises out of the construction of the pile foundation for two residential buildings at the Project, located at 270 Greenwich Street in Manhattan. The real property on which the construction took place was owned by 270 Greenwich Street Associates LLC ("the Owner"), a company controlled by Edward J. Minskoff Equities, Inc. ("Minskoff"). (See Defendant's Statement of Material Facts Pursuant to Rule 56.1 of the Local Civil Rules of the Southern District of New York ("Def.'s 56.1 St."), ¶ 2.)

The Owner hired HRH Construction LLC ("HRH") as its general contractor for the Project. HRH entered into a written subcontract with Urban Foundation Engineering, LLC ("Urban"), to excavate the site and construct the foundation. (See id. ¶ 3.) Urban, in turn, entered into a subcontract or Purchase Order with Underpinning to perform pile driving work and related services for the Project. (See Plaintiff's Statement of Material Facts Pursuant to Rule 56.1 of the Local Civil Rules of the Southern District of New York ("Pl.'s 56.1 St."), ¶ 1.) Under the Purchase Order, Underpinning was required to furnish approximately 600 Tapertube piles, each driven to a capacity of 240 tons. (See Def.'s 56.1 St. ¶ 5; Purchase Order, Exhibit ("Ex.") A to David van Leeuwen Affidavit in Opposition to Plaintiff's Motion for Partial Summary Judgment, dated June 4, 2010 ("Leeuwen Aff.").) The Purchase Order specified

2

that Underpinning was to complete the driving of the production of the piles in six (6) weeks, using two rigs. (See Def.'s 56.1 St. ¶ 6; Leeuwen Aff. ¶ 12.)  The agreed price for the Subcontract and five items of extra work performed by Underpinning was $3,411,450. (See Pl.'s 56.1 St. ¶ 2.)

Urban issued six checks to Underpinning, totaling $2,294,000, for Underpinning's work on the Project. (See id. ¶ 3.)  However, Urban failed to issue the remaining $1,117,050 to Underpinning, and, in this action, it is that deficiency that Underpinning seeks from Travelers, from whom Urban secured a Payment Bond.  The Payment Bond covers the claims of Urban's unpaid subcontractors on the Project. (See Declaration of Alan Winkler, Esq., dated Apr. 16, 2010 ("Winkler Decl."), Ex. D.)

One of Travelers' defenses to Underpinnings' claim for payment consists of a number of set-offs, denominated as Urban backcharges, with a total value of $1,151,761. (See Def.'s 56.1 St. ¶ 15.) Travelers argues that, because of delays caused by Underpinning, Urban incurred the additional costs contained in the backcharges. Travelers contends that Underpinning commenced driving the production piles on April 18, 2006, with one pile rig, rather than two.  Travelers admits, however, that by June 23, 2006, Underpinning had furnished and installed 626 of the 758 required

piles[1] and, at that point, was on or close to schedule. After that date, Underpinning's production ceased, until August 11, 2006 — a seven-week period. (See Def.'s 56.1 St. ¶¶ 7-8; Leeuwen Aff. ¶¶ 13-14.) Urban and Travelers concede that one week of that delay was due to an industry-wide strike. (See Leeuwen Aff. ¶ 14.) But, they contend that the remainder of the delay was due to material supply problems Underpinning experienced. (See id. ¶ 15.) Underpinning argues that the delays were due to adverse field conditions and the absence of areas to store its piles. However, that issue is not the subject of the instant motion, and remains to be resolved at trial.

The instant motion is premised on the contention that Travelers failed to submit competent proof that Urban actually incurred certain of the costs that gave rise to the set-offs.

**DISCUSSION**

I.   **Summary Judgment Standards**

Under Rule 56(c) of the Federal Rules of Civil Procedure, a motion for summary judgment should be granted "if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c); see also Celotex Corp. v. Catrett, 477 U.S. 317,

---

[1] It appears that the parties agreed to increase the number of required piles from the 600 in the Purchase Order.

322-23, 106 S. Ct. 2548, 2552-53 (1986); <u>Shannon v. N.Y. City
Transit Auth.</u>, 332 F.3d 95, 98 (2d Cir. 2003).   The burden of
demonstrating the absence of any genuine dispute as to material
facts rests upon the party seeking summary judgment. <u>See Adickes
v. S. H. Kress & Co.</u>, 398 U.S. 144, 157, 90 S. Ct. 1598, 1608
(1970); <u>Weinstock v. Columbia Univ.</u>, 224 F.3d 33, 41 (2d Cir.
2000).   Once a properly supported motion for summary judgment has
been submitted, the burden shifts to the non-moving party to make
a sufficient showing to establish the essential elements of the
claims on which it bears the burden of proof at trial. <u>See Hayut
v. State Univ. of N.Y.</u>, 352 F.3d 733, 743 (2d Cir. 2003); <u>Peck v.
Pub. Serv. Mut. Ins. Co.</u>, 326 F.3d 330, 337 (2d Cir. 2003) (citing
<u>Celotex</u>, 477 U.S. at 323, 106 S. Ct. at 2553).

In assessing the record to determine whether there is a
genuine issue to be tried as to any material fact, courts are
required to resolve all ambiguities and draw all permissible
factual inferences in favor of the party against whom summary
judgment is sought. <u>See Anderson v. Liberty Lobby, Inc.</u>, 477 U.S.
242, 255, 106 S. Ct. 2505, 2513 (1986); <u>McClellan v. Smith</u>, 439
F.3d 137, 144 (2d Cir. 2006).   However, the non-moving party must
put forth "specific facts showing a genuine issue for trial." Fed.
R. Civ. P. 56(e)(2).   A summary judgment "opponent must do more
than simply show that there is some metaphysical doubt as to the
material facts." <u>Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio</u>

5

Corp., 475 U.S. 574, 586, 106 S. Ct. 1348, 1356 (1986).   The non-moving party may not rely on its pleadings, mere allegations, simple denials, conclusory statements, or conjecture to create a genuine issue for trial. See Anderson, 477 U.S. at 256-57, 106 S. Ct. at 2514; Guilbert v. Gardner, 480 F.3d 140, 145 (2d Cir. 2007).

## II.  Travelers' Obligations Under the Payment Bond

Before turning to the merits of the instant motion, the Court must first address Travelers' obligations under the Payment Bond. Urban obtained the Payment Bond from Travelers, pursuant to which Travelers guaranteed prompt payment to subcontractors and suppliers, such as Underpinning, for work performed or materials supplied for Urban's work on the Project.   Thus, although Underpinning is not a party to the Payment Bond, it has standing to sue for payment under the Bond. See N.Y. State Fin. Law § 137(3) (McKinney 2008) ("Every person who has furnished labor or material, to the contractor or to the subcontractor . . . , shall have the right to sue on such payment bond . . . .").[2]

Travelers' liability under the Payment Bond is measured by the

_____

[2] The parties have cited New York law in support of their respective positions and, therefore, the Court applies New York law in this diversity action.  See Am. Fuel Corp. v. Utah Energy Dev. Corp., 122 F.3d 130, 134 (2d Cir. 1997) ("[W]here the parties have agreed to the application of the forum law, their consent concludes the choice of law inquiry."); see also Krumme v. Westpoint Stevens, Inc., 238 F.3d 133, 138 (2d Cir. 2000) ("The parties' briefs assume that New York law controls, and such implied consent . . . is sufficient to establish choice of law.") (internal quotation marks omitted).

liability of its principal, Urban, as "[i]t is a well settled rule in [New York] that the liability of the surety is measured by the liability of the principal." <u>EFCO Corp. v. Liberty Mut. Ins. Co.</u>, 24 Misc.3d 1226(A), 897 N.Y.S.2d 669 (Sup. Ct., N.Y. Cnty. 2009) (citing <u>Am. Bldg. Supply Corp. v. Avalon Props., Inc.</u>, 8 A.D.3d 515, 516, 779 N.Y.S.2d 517, 519 (2d Dep't 2004); <u>Venus Mech. v. Ins. Co. of N. Am.</u>, 245 A.D.2d 559, 559, 667 N.Y.S.2d 60, 61 (2d Dep't 1997); <u>Dimacopoulos v. Consort Dev. Corp.</u>, 158 A.D.2d 658, 660, 552 N.Y.S.2d 124, 126 (2d Dep't 1990)); <u>see also</u> <u>Premier-New York, Inc. v. Travelers Prop. Cas. Corp.</u>, 20 Misc. 3d 1115(A), 867 N.Y.S.2d 20 (Sup. Ct., N.Y. Cnty. 2008)("surety's exposure is co-extensive with the liability assumed by its named 'principal,' the contractor"). Accordingly, because Urban failed to issue the remaining $1,117,050 due to Underpinning pursuant to the Purchase Order, Underpinning has a claim against Travelers, as Urban's surety, in that amount, less any allowable set-offs.

## III. Proof of Damages for Travelers' Set-Offs

In the instant motion, it is the extent of Travelers' liability that is at issue, due to the set-offs Urban has claimed against Underpinning, resulting from purported delays in Underpinnings' work. Underpinning claims that there has been inadeqate proof of certain of Urban's set-offs and, therefore, as a matter of law they must be disallowed.

Under New York law, "[a] contractor wrongfully delayed by its

[subcontractor] must establish the extent to which its costs were increased by the improper acts because its recovery will be limited to damages actually sustained." Berley Indus. v. City of New York, 45 N.Y.2d 683, 687, 412 N.Y.S.2d 589, 591 (1978); accord Mid-State Precase Sys. v. Corbetta Constr. Co., 202 A.D.2d 702, 704, 608 N.Y.S.2d 546, 548 (3d Dep't 1994). "[T]here must be a definite and logical connection between what is proven and the damages sought to be recovered." Mid-State, 202 A.D.2d at 704, 608 N.Y.S.2d at 548. Speculation or conjecture is not adequate to prove damages. See Berley, 45 N.Y.2d at 687, 412 N.Y.S.2d at 591; E.E. Cruz v. Coastal Caisson, Corp., 346 F. App'x 717, 719-20 (2d Cir. 2009).

Nevertheless, it is well-established that when it is clear that some injury has been sustained, "recovery will not necessarily be denied a [party] when it it is apparent that the quantum of damage is unavoidably uncertain, beset by complexity or difficult to ascertain." Berley, 45 N.Y.2d at 687, 412 N.Y.S.2d at 591; see also Wolff & Munier, Inc. v. The Whiting-Turner Contracting Co., 946 F.2d 1003, 1010 (2d Cir. 1991). Juries may draw reasonable inferences from "lesser proofs . . . in order to arrive at an estimate of the amount of extra costs which are the natural and probable result of delay." Berley, 45 N.Y.2d at 687, 412 N.Y.S.2d at 591. Where a precise measure of delay damages is not possible, it is not required, so long as some rational basis is furnished for calculating a reasonable estimate of damages. See Manshul Constr.

8

Corp. v. Dormitory Auth. of New York, 79 A.D.2d 383, 387, 436 N.Y.S.2d 724, 728 (1st Dep't 1981). Damages must be proven with reasonable certainty, not absolute certainty or exactness. See Stanford Square, L.L.C. v. Nomura Asset Capital Corp., 229 F. Supp. 2d 199, 207 (S.D.N.Y. 2002).

## IV. Application to Claimed Set-Offs

Travelers has asserted a number of set-offs, totaling $1,151,761, for which it is claiming a deduction against any payment it may ultimately be called upon to make to Underpinning under the Payment Bond. These set-offs are delineated into three categories: (1) $601,100.00 for extended field overhead incurred by Urban; (2) $232,000.00 for additional foundation work costs; and (3) $318,661.00 for HRH backcharges. (See Winkler Decl. Ex. E.) In the instant motion, Underpinning asserts that the following set-offs are not recoverable: (1) $38,199.78 of the $601,100.00 for additional foundation work costs, attributed to delays in June 2006, a time when Travelers admits that Underpinning was on or close to schedule; (2) $126,000.00 of the $232,000.00 for additional foundation work costs,[3] which Underpinning contends is supported only by estimates and not any documentary evidence; and (3) $249,166.00 of the $318,661.00 of HRH backcharges, which Underpinning asserts was never paid to HRH by Urban.

---

[3] Of the remaining $106,000 of this set-off, Travelers has withdrawn its claimed set-off in the amount of $55,000 relating to the structural steel subcontractor.

A. <u>Urban's Extended Field Overhead</u>

Travelers' first set-off, in the amount of $601,100.00, relates to extended field overhead incurred by Urban, including such items as premium time, the additional time of a teamster, master mechanic, maintenance foreman, and watchman service, and dewatering costs (inclusive of 15% for Urban's overhead). (<u>See</u> Pl.'s 56.1 St. ¶¶ 5-6; Def.'s 56.1 St. ¶ 29.)   This set-off is premised on a claim that Underpinning caused a delay in Urban's work, resulting in its completion after September 4, 2006. However, Urban's delay costs include costs for the week of June 14 to 21, 2006.   (<u>See</u> Pl.'s 56.1 St. ¶¶ 7, 12.)   Underpinning moves for summary judgment with respect to this portion of the extended field overhead set-off, in the amount of $38,199.78.

Underpinning contends that, prior to June 23, 2006, the Project was on or close to schedule.   Moreover, David van Leeuwen, Urban's Project Manager, prepared the set-offs, and he testified at his deposition that he did not know why he had included the costs incurred in the week of June 14 to 21. (<u>See</u> Deposition Transcript of David van Leeuwen, dated Aug. 19, 2008 ("Leeuwen Dep."), Ex. G. to Winkler Decl., at 418.)   And, when Urban's President, Anthony Mazzo, first presented backcharges to Underpinning, at a close-out meeting on December 21, 2006, after Urban and Underpinning had come to an agreement on the adjusted price of Underpinning's subcontract, the backcharges did not include any costs for June

10

2006, except for pile cap concrete costs charged at $300 per cubic yard, for a total of $51,000.[4] (See Winkler Decl. ¶¶ 10-11; Deposition Transcript of Anthony Mazzo, dated Dec. 2, 2008 ("Mazzo Dep."), Ex. H to Winkler Decl., at 170-72;  Winkler Decl. Ex. M.)

In response to Underpinning's contention that there was no delay in June, Travelers claims that Underpinning failed to meet the contractual requirement that the piles be driven to a 240-ton capacity; instead, the piles could only achieve a 200-ton capacity. As a result, 83 additional piles had to be driven, delaying the Project for at least five days, which is the period during which the $38,199.78 in extended field overhead costs was allegedly incurred.  (See Leeuwen Aff. ¶¶ 32-34.)  Mr. van Leeuwen contends that after his deposition, "he went back and determined that this was the basis of Urban's claim for this one week of delay . . . ." (Id. ¶ 35 n.4.)

Underpinning argues that Mr. van Leeuwen's affidavit impermissibly contradicts his deposition testimony, see FDIC v. Wrapwell Corp., No. 93 Civ. 859 (CSH), 2002 WL 14365, at *14 (S.D.N.Y. Jan. 3, 2002), and also conflicts with his own admission that as of June 23, 2006, "Underpinning was on or close to schedule." (Leeuwen Aff. ¶ 13.)  The Court agrees.  Mr. van Leeuwen made clear at his deposition that he did not know why there

_____

[4] This amount is included in Travelers' asserted set-off for additional foundation work costs.  Underpinning has not moved for summary judgment with respect to this cost.

were any delay charges for the week of June 14 to 21, despite having prepared the set-offs. (See Leeuwen Dep. at 418.) He did not claim that he could not recall what these charges were for, or that he would need to look into the matter further. In addition, according to van Leeuwen, Underpinning's alleged failure to drive the first 626 piles to a 240-ton capacity, resulted in the need to drive additional piles. But, this additional work was completed in nine days, after Underpinning recommenced work on August 11, 2006. (See Leeuwen Aff. ¶ 18.) Therefore, no reasonable juror could conclude that the need to drive additional piles in August caused delay costs in June. By van Leeuwen's own admission, the Project was on schedule in June. (See id. ¶ 13.) Thus, his newly-minted explanation, which is devoid of any documentary support and presented for the first time in opposition to Underpinning's motion for summary judgment, will not be considered.

Because there is no competent evidentiary support for Travelers' claimed set-off of $38,199.78, for purported delays during the week of June 14 to 21, no reasonable juror could conclude that Travelers is entitled to this set-off. Accordingly, Plaintiff is entitled to summary judgment disallowing the set-off.

B. Additional Foundation Work Costs

Travelers' second set-off, in the amount of $232,000.00, relates to additional costs Urban alleges it incurred in performing the foundation work for the Project, as a result of Underpinning's

12

performance. (See Winkler Decl. Ex. E.) Underpinning challenges a portion of that set-off, in the amount of $126,000.00. (See Pl.'s 56.1 St. ¶ 15.) Specifically, Underpinning challenges: (1) $25,000.00 for excavation/disposal of a conduit duct bank; (2) $30,000.00 for handling rebar under the first floor deck; (3) $32,000.00 to revise wall detail; and (4) $39,000.00 for piers on pile caps to receive steel columns. (See id.; Winkler Decl. Ex. E.) Mr. van Leeuwen testified at his deposition that these alleged additional costs were based on estimates and not actual costs. (See Leeuwen Dep. at 426-428, 429-30, 433-35, 439.) However, Mr. Mazzo, who did not prepare the set-offs, claimed that there was a written calculation made to arrive at that scope of work. (See Mazzo Dep. at 173-74.) Although requested, no supporting documentation was ever produced. (See Pl.'s 56.1 St. ¶ 19; Winkler Decl. ¶ 18.)

Nevertheless, in response to Plaintiff's motion, Mr. van Leeuwen claims to have gone back to Urban's daily reports and calculated the actual expenses for labor and equipment. In his affidavit, he sets forth new calculations for the $126,000.00 of set-offs, accompanied by documentation never produced in this litigation.

Plaintiff argues that the information in Mr. van Leeuwen's affidavit contradicts his deposition testimony and, therefore, cannot be used to defeat Underpinning's motion. In addition, Underpinning argues that (1) the calculation of damages that

Travelers now presents for the extra work is different than the calculations in its initial disclosures pursuant to Federal Rule of Civil Procedure 26; (2) the documents belatedly provided in support of Mr. van Leeuwen's new calculations do not support his conclusions and further support Underpinning's position that Mr. van Leeuwen is still estimating how much time was spent in excavating the conduit trench; and (3) Travelers' claim is for all of the time and work Urban purportedly expended because of Underpinning's delay, but does not account for the time and work that would have been required even if there had been no delay (that is, its claim should be for the difference between the costs originally contemplated and the actual costs resulting from the delay).

1.   Does van Leeuwen's Affidavit
     Contradict his Deposition Testimony?

Plaintiff correctly argues "that a party cannot create an issue of fact by submitting an affidavit in opposition to summary judgment that contradicts prior deposition testimony." Gorzynski v. Jetblue Airways Corp., 596 F.3d 93, 104 (2d Cir. 2010); accord Brown v. Henderson, 257 F.3d 246, 252 (2d Cir. 2001) ("factual allegations that might otherwise defeat a motion for summary judgment will not be permitted to do so when they are made for the first time in the plaintiff's affidavit opposing summary judgment and that affidavit contradicts her own prior deposition testimony"). As set forth in further detail below, some of the

14

evidence now offered by van Leeuwen does, in fact, contradict his prior deposition testimony, and should not be considered. Although van Leeuwen contends that, in response to Plaintiff's motion, he simply reviewed various documents and arrived at a damage figure that was largely consistent with his estimated damages, Mr. van Leeuwen's affidavit cannot be viewed merely as an amplification of his deposition testimony, because he now claims to have redone his damage calculations and has provided a new rationale for the calculations. Cf. Gorzynski, 596 F.3d at 104 ("If, however, the allegations in the affidavit, rather than contradicting, explain or amplify prior deposition testimony, then the affidavit may create a genuine issue of material fact sufficient to defeat summary judgment.").

### a. *Excavation for Conduit Duct Banks*

At his deposition, Mr. van Leeuwen testified that the excavation for conduit duct banks was performed in October, and the work was scheduled by Mr. Demodna, an Urban employee. (See Leeuwen Dep. at 426-27.) Van Leeuwen estimated a cost of $50 per cubic yard based on "[t]he length of time that we had additional equipment and labor doing this work." (Id. at 427.) He did not know exactly what the length of time was, nor could he remember how many additional excavators were needed for "moving dirt in the cellar." (Id.) The labor component was simply "an estimate of what we thought that it costs." (Id. at 427-28.) The $50 estimate

15

was then multiplied by 500 cubic yards, which van Leeuwen testified was "a plan take off, so . . . it's fairly accurate." (Id. at 429-30.)  The end result was $25,000.

In response to the instant motion, van Leeuwen now justifies this cost as follows: Although the structural steel work was not supposed to commence until the foundation was completed, Urban was forced to excavate for the conduit duct bank beneath the first floor steel deck, because of Underpinning's 7-week delay in pile driving.  This was a more costly operation, requiring two smaller machines instead of one large backhoe. (See Leeuwen Aff. ¶ 39.) Based upon the daily reports for October 3 to 6, 10, 17 to 20, and 23 to 24, 2006, van Leeuwen determined that the work required 21 machine days and 11 half-days of labor, resulting in a cost of $24,935.00, based on the hourly rates of each worker and the daily rates to rent the machines.  (See id. ¶ 40 & Ex. H.)  Nowhere in this admittedly more precise calculation - which is based on documents never produced in this litigation - does van Leeuwen mention cubic yards or cost per cubic yard as he did at his deposition.  Therefore, in opposing Plaintiff's motion, van Leeuwen has presented a different basis for this set-off than he did at his deposition.

### b. *Handling Rebar Under First Floor Deck*

At his deposition, van Leeuwen explained that the $30,000 estimate for handling rebar under the first floor deck was for

approximately "four to six weeks" of moving the rebar "from place to place." (Leeuwen Dep. at 428-29.) He estimated its weight to be 300,000 pounds, which he believed to be "within 5 percent" of the exact weight, based on reinforcement steel drawings. (See id. at 429.) He then multiplied that number by $.10 per pound, "an estimate of how much time and labor we spent." (Id. at 430.) Van Leeuwen conceded, however, that he "backed in to that unit price," because Mr. Demodna had told him that the cost was approximately $30,000, and he determined the weight to be 300,000 pounds (i.e., 30,000 divided by 300,000 equals .10).

In his affidavit, van Leeuwen now contends that this $30,000 set-off was based on two additional lathers employed by Urban's subcontractor, CB Contracting Corp., for 21 days, working eight-hour days at $91.89 per hour.[5] (See Leeuwen Aff. ¶ 43.) He therefore claims that the actual cost is $30,875.00, which is similar to the estimated cost.

As an initial matter, the daily reports belatedly submitted to support this charge have a space designated to indicate use of lathers. Yet, Urban never marked this space on any of these daily reports to reflect the use of one, let alone, two lathers. (See id. Ex. I.) Further, although van Leeuwen testified at his deposition that he used a calculation based on pounds and price per

---

[5] The Court assumes that Mr. Van Leeuwen's use of a figure of $91.89 per day was an inadvertent error, and that he intended to indicate that the rate was $91.89 per hour.

pound for *moving* the rebar, he now seeks to base this set-off on the time and hourly rate of lathers to *install* the rebar. In fact, he was specifically asked at his deposition if this cost related to "actually tying the rebar," and responded that it was for "moving it from place to place." (Leeuwen Dep. at 429.) Thus, this aspect of van Leeuwen's affidavit in opposition to Plaintiff's motion clearly contradicts his deposition testimony.

c. *Revised Foundation Wall Detail*

The cost for the revised foundation wall detail was estimated, at van Leeuwen's deposition, to be $32,000. This amount was based on 320 linear feet multiplied by an estimated $100 per linear foot. (See Leeuwen Dep. at 433-34.) Although the measurement was apparently accurate, the cost per linear foot was an estimate that considered "how much time and material" was necessary to do the work. (See id. at 434.) No further elaboration was given, and van Leeuwen testified that he was unaware of any documents that might refresh his recollection on how he arrived at the estimate. (See id.)

In response to the instant motion, van Leeuwen has now calculated the alleged exact hours, days, and hourly rates spent by Urban to conduct this work. (See Leeuwen Aff. ¶ 46.) As support, van Leeuwen includes more daily reports - again, none of which were produced during the discovery period. (See id. Ex. J.) He concludes that this work cost Urban $32,151.00. (See id. ¶ 46.)

With the exception of the lumber used, which is based on a cost per linear foot, none of the other calculations are based on anything other than time and rate per hour. Again, van Leeuwen contradicts his deposition testimony.

d. *Piers on Pile Caps*

At his deposition, van Leeuwen estimated the cost of installing additional concrete piers atop the pile caps to be $39,000. This estimate was purportedly based on the amount of concrete multiplied by the unit prices, which would include both labor and material costs. Van Leeuwen provided no numbers at his deposition - even estimates - that resulted in this $39,000 set-off. He alluded to "a yellow sheet of paper" in his office that might have additional information, but this document was never produced. (See Leeuwen Dep. at 435-39.)

In his affidavit, van Leeuwen asserts that he has since reviewed the alternate shop drawings for this work, determined the number of piers that Urban had to pour, and the volume of concrete and additional form work and reinforcing steel required. He then estimated the labor hours required to perform the extra work based on his years of experience as a foundation estimator witnessing similar work, and concluded that the additional labor and materials resulted in an expense to Urban of $38,901.00. $3,400 of that total represented actual expenses for reinforcing steel and a motor buggy rental. (See id. ¶¶ 49-51.) While this information is not

19

contradictory per se, van Leeuwen never provided any numbers at his deposition other than the final estimate, and therefore, this information is simply an attempt to bolster that estimate.

   2.   Does van Leeuwen's Affidavit Contain
        Different Calculations than Travelers'
        Rule 26 Disclosures?

In addition to the inconsistencies between van Leeuwen's affidavit and his deposition testimony, there are other, more troubling problems with Travelers' submission. Federal Rule of Civil Procedure 26(a)(1)(A) requires a party to produce as part of its initial disclosures a computation of each category of damages claimed, and to make available for inspection all documents on which the damage computation has been made. See Design Strategy, Inc. v. Davis, 469 F.3d 284, 295 (2d Cir. 2006) ("Rule 26(a) requires a party - in addition to providing a calculation of damages - to make available for inspection and copying as under Rule 34 the documents or other evidentiary material . . . on which such computation is based.") (internal quotation marks omitted). Under the Federal Rules, if a party fails to provide such information, "the party is not allowed to use that information . . . to supply evidence on a motion, at a hearing, or at a trial, unless the failure was substantially justified or is harmless." Fed. R. Civ. P. 37(c)(1). Among the factors a court should consider in deciding whether to exclude evidence are (1) a party's explanation for the failure to comply with the Federal Rules, (2)

the importance of the evidence, (3) the prejudice suffered by the opposing party of having to prepare to meet the new evidence, and (4) the possibility of a continuance. See Design Strategy, 469 F.3d at 296. The purpose of this rule "is to prevent the practice of 'sandbagging' an opposing party with new evidence." Fleming v. Verizon New York Inc., No. 03 Civ. 5639 (WHP), 2006 WL 2709766, at *7 (S.D.N.Y. Sept. 22, 2006).

During the discovery period, Travelers merely presented an itemization of damages based on van Leeuwen's estimates. Travelers did not submit any supporting documentation with its original estimated damage calculation; indeed, Mr. van Leeuwen testified that he was unaware of any documents that existed that indicated how he arrived at his estimated costs. (See, e.g., Leeuwen Dep. at 428, 433.) He further indicated that the basis for his calculation of labor and equipment costs was an estimate provided to him by another Urban employee. (See id. at 429.) The documents that van Leeuwen subsequently relied upon in redoing his damage calculations were not provided to Plaintiff in discovery, as support for Urban's backcharges, and no explanation has been provided for that failure. (See Pl.'s 56.1 St. ¶ 19.)⁶ Discovery is now closed in this three-

---

⁶ Under Local Civil Rule 56.1 of the Southern District of New York, a party opposing a motion for summary judgment is required to submit a statement corresponding to the moving party's statement of undisputed facts. Although Defendant submitted a Rule 56.1 Statement, it does not correspond to Plaintiff's Statement. Moreover, nowhere does it deny Plaintiff's contention that no documents were provided in discovery to

year old litigation, and Plaintiff did not have an opportunity to depose Mr. van Leeuwen about these documents.  Similarly, Plaintiff was unable to address these documents or calculations in making the instant motion, and would therefore be prejudiced by their consideration.  Accordingly, the documents will not be considered as giving rise to a material factual dispute.

Thus, in the first instance, the Court must determine whether Travelers can assert a set-off for these purported costs, based solely on van Leeuwen's estimates and the itemization of damages provided during pretrial discovery.  The Court concludes that it may not do so.  Because this set-off is based on actual work that was performed, and not some hypothetical or future work and costs that will result from Underpinning's delay, Travelers may not, as a matter of law, assert these set-offs based on conclusory estimates.  See Berley, 45 N.Y.2d at 687, 412 N.Y.S.2d at 591 ("unlike job site overhead increases whose relationship to a particular job will usually be capable of direct proof, the connection between home office overhead increases and delay in a particular project will more often be indirect"); Metro. Steel Indus., Inc. v. Perini Corp., 36 A.D.3d 568, 569, 828 N.Y.S.2d 395, 396 (1st Dep't 2007) (reliance on estimates as proof of the value of extra work that was performed was improper); Mid-State, 202

support Urban's backcharges.  Accordingly, that fact is deemed admitted. See Local Civil Rule 56.1(c).

A.D.2d at 704, 608 N.Y.S.2d at 548 (a letter stating that plaintiff sustained delay damages in a certain amount, based primarily on estimates of increased costs, without supporting documentation and verification, was inadequate proof of delay damages); <u>Fehlhaber Corp. v. State of New York</u>, 69 A.D.2d 362, 368, 419 N.Y.S.2d 773, 775-76 (3d Dep't 1979) (claim for actual costs was properly supported with daily records "meticulously record[ing] the number of men and machines on the job each day as well as the type of work being done on each day"); <u>cf. Elec. Servs. Int'l v. Silvers</u>, 284 A.D.2d 317, 368, 726 N.Y.S.2d 441, 442 (2d Dep't 2001) ("Proof of damages may be based solely on oral testimony as long as the witness has knowledge of the <u>actual</u> costs.") (emphasis added).

> 3.  <u>Would the Daily Reports, If Considered, Establish Travelers' Set-Off Damages?</u>

In any event, the documents that have been belatedly provided to support van Leeuwen's more recent damage calculations, fall far short of what is required to establish Travelers' set-off damages. The only documents that have been submitted are Urban's daily reports for various days in September, October, and November of 2006. (<u>See</u> Leeuwen Aff. Exs. H, I, J.)  These documents simply record the number and type of laborers who worked on particular days, and the equipment and materials that were used.  Yet, other than Mr. van Leeuwen's unsupported assumption of certain hourly or daily costs associated with the laborers and equipment, no documents have been submitted to support those assumptions.

In addition, the documents do not even support all of van Leeuwen's calculations. For example, van Leeuwen contends that it took laborers 11 half-days to perform the excavation for the conduit duct (or electrical trench) beneath the first floor steel deck. (See Leeuwen Aff. ¶ 40.) However, the work descriptions in Urban's daily reports describe the excavation work as taking place on only eight of those days. (See id. Ex. H.) Moreover, it is apparent that van Leeuwen continues to estimate how much time was spent each day on that work, as the reports show laborers working an eight-hour day, but van Leeuwen apportions half of their time to the excavation work, with no further explanation or support. (See id.) Finally, although Travelers contends that Underpinning's delay caused it to engage in a more timely and costly procedure in order to excavate the utilities duct, it would only be entitled to the difference between what the work would have cost had there been no delay and what it actually cost. Yet, the claimed backcharge is for all of the work performed in excavating the utilities duct, not just the additional cost associated with the delay.

The set-off for handling the rebar under the first floor deck suffers from similar deficiencies. Mr. van Leeuwen asserts that because of Underpinning's delay in completing the foundation, two additional lathers were employed by Urban's subcontractor, CB Contracting Corp., to perform rebar work while working below the steel structural deck. He asserts that two men, working for 21

24

days, eight hours per day, at a rate of $91.89 per hour, resulted in additional costs of $30,875.00. (See Leeuwen Aff. ¶¶ 42-43.) However, as Underpinning points out, those costs were not incurred by Urban because CB's contract with Urban called for it to perform its work on the basis of a fixed price per pound of rebar, not on the basis of hourly work, and there is no evidence in the record that Urban was actually billed for the additional labor used to install the rebar. (See Declaration of Alan Winkler in Reply to Defendant's Opposition to Plaintiff's Motion for Partial Summary Judgment, dated June 23, 2010 ("Winkler Reply Decl."), Ex. J.) Thus, there is no support in the record for van Leeuwen's assertion that "Urban's actual contemporaneous documents confirm that it expended this sum for labor to handle rebar under the structural steel deck." (Leeuwen Aff. ¶ 44.)

In addition to the more general objections to Mr. van Leeuwen's revised calculations, Underpinning points out that in the set-off for the extra work costs related to the revised foundation wall detail, van Leeuwen included a charge for a lather working for seven 8-hour days, (see Leeuwen Aff. ¶ 46), while the Urban daily reports do not show a lather working on any of those days. (See id. Ex. J.)

Finally, Mr. van Leeuwen concedes that his calculation of the set-off for adding concrete to the pile caps is based on estimates. Mr. van Leeuwen states that after reviewing the shop drawings, he

was able to determine the number of piers that Urban had to pour, the volume of concrete used, the additional form work required, and the reinforcing steel required for each pier. There are no supporting documents for the calculations van Leeuwen performed. Moreover, the most significant item in this set-off of $38,901.00 is for labor, but the only basis for determining the amount of labor that was required is Mr. van Leeuwen's estimates of how long such work <u>should</u> take, based on his experience. (<u>See</u> Leeuwen Aff. ¶ 51.)

Where circumstances render it impracticable to be exact about one's damages, some flexibility is allowed. <u>See</u> <u>Berley</u>, 45 N.Y.2d at 687, 412 N.Y.S.2d at 591 ("[W]hen it is clear that some injury has been occasioned, recovery will not necessarily be denied a plaintiff when it is apparent that the quantum of damage is unavoidably uncertain, beset by complexity or difficult to ascertain. The law is realistic enough to bend to necessity in such cases.") (internal citations omitted). Nevertheless, this is not such a situation. The set-off Travelers is seeking is based on actual, as opposed to hypothetical or future work that was performed. There is no reason why records could not have been kept of the number of laborers and the amount of time spent in performing that work. <u>See</u> <u>id.</u> at 687, 412 N.Y.S.2d at 591; <u>Metro.</u> <u>Steel Indus.</u>, 36 A.D.3d at 569, 828 N.Y.S.2d at 396; <u>Mid-State</u>, 202 A.D.2d at 704, 608 N.Y.S.2d at 548.

In sum, because (1) van Leeuwen provided support for the Urban set-offs in response to Plaintiff's motion, that was inconsistent with the support he provided at his deposition, (2) Travelers was dilatory in producing any basis for its delay set-offs, (3) the support for its claimed damages was not produced in discovery, and (4) even when finally produced in response to the instant motion, there was a failure to provide competent evidence supporting the set-offs, Underpinning is entitled to summary judgment dismissing Travelers'/Urban's delay set-offs for additional foundation work costs.

C.  HRH Backcharges

Travelers' final asserted set-off, in the amount of $318,661.00, relates to the following backcharges claimed to have been asserted by HRH, the general contractor on the Project, against Urban:

1) $58,841.00 for HRH direct labor costs and overtime;

2) $6,160.00 for weekend permits;

3) $69,495.00 for sidewalk bridge modification;

4) $16,325.00 for temporary water-plumber standby;

5) $18,348.00 for extra work by an electrician;

6) $149,492.00 for HRH general conditions due to delay.

(See Pl.'s 56.1 St. ¶ 21; Winkler Decl. Ex. N.)

Of that total, the only HRH backcharge that was included as a change order to Urban, and which Urban paid to HRH, is the item for

the sidewalk bridge modification, in the sum of $69,495.00. (See Pl.'s 56.1 St. ¶ 24; Winkler Decl. Ex. O; Deposition Transcript of Paul Jennings, dated Dec. 4, 2008, Winkler Decl. Ex. I, at 27-31.) Yet, Urban was supposed to list all of its change orders in its requisitions to HRH. (See Mazzo Dep. at 58.)    Therefore, Underpinning contends that Travelers cannot assert the remaining $249,166.00 in HRH backcharges as a set-off, because there is no evidence that Urban paid these backcharges.

Travelers responds that, as a result of Underpinning's delay, HRH asserted a claim against Urban in the amount of $334,071.00.[7] It submits a letter, dated February 8, 2007, from Paul Jennings, HRH's Project Manager, detailing HRH's delay backcharges, along with the underlying documentary support for the charges. (See Leeuwen Aff. Ex. E.)   Underpinning does not dispute that these charges have some documentary support, and the February 8 letter was produced in discovery.    Rather, Underpinning contends that Urban did not incur these charges, because HRH never included them in a change order to Urban.

Travelers argues, however, that Urban did, in fact, incur all of those damages.   Specifically, Travelers contends that HRH did

---

[7] Although it appears that the full amount of the HRH backcharge was $334,071.00 (see Leeuwen Aff. Ex. E), the amount that Travelers asserted against Underpinning was $318,661.00. (See Winkler Aff. Ex. E.).   Thus, $318,661.00 less $69,495.00 results in a remaining set-off of $249,166.00, which is the amount that Underpinning is challenging in the instant motion. (See Leeuwen Aff. ¶ 24 n.2.)

not include the $249,166.00 of backcharges in a change order to Urban, but instead, sought compensation from Minskoff, the Owner, who, in turn, sought reimbursement from Urban. During the final closeout negotiations of the Project, on November 29, 2007, between Urban's President and Carlos Olivieri, Minskoff's Senior Vice President for Construction, Urban was apparently forced to give the Owner a credit of $249,166.00 for the HRH backcharges. (See Leeuwen Aff. ¶ 25; Affidavit of Anthony Mazzo, dated June 4, 2010 ("Mazzo Aff."), ¶¶ 2-10.)   Olivieri confirms that fact, stating that Urban's claim for $1,126,702.00 for additions to the Project plans and specifications, and for removal of contaminated soil from the site, was reduced substantially to account for the backcharges incurred by HRH. (See Affidavit of Carlos Olivieri, Jr., dated June 4, 2010 ("Olivieri Aff."), ¶¶ 7-9.)

Underpinning responds that Urban had no legal obligation to compensate the Owner for HRH's backcharges. It argues that Urban did not have a contractual relationship with the Owner — it was a subcontractor to the general contractor, HRH. Thus, according to Underpinning, since Urban was under no obligation to make payment to the Owner for HRH's backcharges, it acted as a volunteer in doing so, and it is not entitled to indemnification from Underpinning. (See Pl.'s Reply at 4.) Moreover, according to Underpinning, under the general contract between HRH and the Owner, HRH was not entitled to compensation from the Owner for delay costs

it incurred as a result of Urban's delay.  Since the Owner was not contractually obligated to pay HRH for the costs it incurred due to Urban's delay, it was not subrogated to HRH's rights against Urban. Travelers has not addressed this issue.

Under New York law, a party who voluntarily makes a payment has "no right to seek indemnification for a loss it was not obligated to pay in the first instance." <u>Reliance Ins. Co. v. State Farm Mut. Auto. Ins. Co.</u>, 243 A.D.2d 456, 457, 664 N.Y.S.2d 958, 958 (2d Dep't 1997).  "The voluntary payment doctrine bars recovery of payments voluntarily made with full knowledge of the facts, and in the absence of fraud or mistake of material fact or law." <u>Merchants Mut. Ins. Group v. Travelers Ins. Co.</u>, 24 A.D.3d 1179, 1180, 806 N.Y.S.2d 813, 813 (4th Dep't 2005) (internal quotation marks omitted).    Moreover, a volunteer is not entitled to subrogation.

> The equitable doctrine of subrogation is applicable to cases where a party is compelled to pay the debt of a third person to protect his own rights, or to save his own property. However, while the scope of subrogation is broad, it cannot be invoked where the payments sought to be recovered are voluntary.  A party seeking subrogation can establish its payments were not voluntary either by pointing to a contractual obligation or to the need to protect its own legal or economic interests.    When invoking the latter ground, however, the party seeking subrogation must show that the act is not merely helpful but necessary to the protection of its interests.

<u>Broadway Houston Mack Dev., LLC v. Kohl</u>, 71 A.D.3d 937, 937, 897 N.Y.S.2d 505, 505 (2d Dep't 2010) (internal citations and quotation marks omitted); <u>accord</u> <u>Travelers Ins. Co. v. Nory Constr. Co.,</u>

Inc., 184 Misc. 2d 366, 372, 708 N.Y.S.2d 252, 257 (Sup. Ct.,
Monroe Cnty. 2000); Merchants Mut. Ins. Co., 24 A.D.3d at 1180, 806
N.Y.S.2d at 813 ("one cannot ask for subrogation with success,
unless either he or his property was in some way lawfully
answerable for the claim paid").  "A payment is not involuntary
simply because it was demanded by the person paid."  Travelers Ins.
Co., 184 Misc. 2d at 372, 708 N.Y.S.2d at 257.

     In effect, with the exception of the $69,495.00 HRH
backcharge, which Urban paid directly, Travelers/Urban is seeking
indemnification for a payment it made to the Owner for alleged
delay costs incurred by HRH, that the Owner allegedly paid directly
to HRH.  Urban was not contractually obligated to pay the costs the
Owner incurred in paying HRH, and, therefore, Urban was not, as a
contractual matter, subrogated to the Owner's rights.  Thus,
Underpinning contends that Urban made a voluntary payment for which
it has no right to indemnification.

     The equitable doctrine of subrogation, however, may exist in
the absence of a contractual obligation, if the party seeking
indemnification shows that a payment was made "to protect its own
legal or economic interests," insofar as the payment is "not merely
helpful but necessary to the protection of its interests."
Broadway Houston, 71 A.D.3d at 937, 897 N.Y.S.2d at 505.  Here,
representatives of both the Owner and Urban have submitted
affidavits in which they state, based on personal knowledge, that

the Owner incurred the HRH backcharges, and then demanded a credit from Urban to reflect those charges.  (See Olivieri Aff. ¶¶ 8-9; Mazzo Aff. ¶¶ 6-10.)  And, according to these individuals, when payment was made by the Owner to Urban, those costs were deducted. Cf. Aniero Concrete Co. v. N.Y.C. Constr. Auth., No. 94. Civ. 9111 (CSH), 2003 WL 21018842, at *3-4 (S.D.N.Y. May 5, 2003) (concluding that oral testimony, based on personal knowledge, is sufficient to support a damages claim, even if the record is devoid of documentary support; the question thus becomes whether the witness is credible and how much weight the trier of fact is to afford the testimony).

Underpinning responds by pointing to Travelers' failure to produce any documentation in discovery to support the assertion that HRH charged the Owner for these costs, who, in turn, sought reimbursement from Urban.  Indeed, Underpinning issued a subpoena duces tecum to the Owner, and requested, among other things, "[a]ll documents relating to requests by HRH for change orders and/or additional compensation," and "[a]ll documents relating to any back charges assessed or considered by [the Owner] against HRH for delays."  (See Winkler Reply Decl. Ex. G.)  No documents reflecting this purported payment were ever received.

And, other than Mr. Olivieri's and Mr. Mazzo's self-serving statements, Travelers merely submits a document in which Mr. van Leeuwen itemizes the costs purportedly incurred by Urban because of

owner-initiated changes in plans and specifications, totaling $1,249,166.00. (See Leeuwen Aff. Ex. F.) The same document identifies HRH backcharges against Urban, in the amount of $249,166.00, which, according to Travelers, were reflected in Urban's settlement of its claim against the Owner, when it allegedly received payment in the amount of $500,000. (See id. ¶ 28 & Ex. G.) There is no explanation of how a $1,249,166.00 claim was settled for $500,000, even though the HRH backcharges, for which a credit was demanded, was only $249,166.00.[8]

Although these documentary and evidentiary deficiencies may prove problematic to Travelers' equitable subrogation claim at trial, the Court cannot conclude that, as a matter of law, Urban made a voluntary payment to the Owner. If a trier of fact accepts the testimony of Mr. Olivieri and Mr. Mazzo, it must then resolve the factual question of whether this payment was made to protect Urban's legal or economic interests, or whether it was, in fact, voluntary. For all of these reasons, Underpinning's motion for summary judgment excluding Travelers' set-off for HRH backcharges in the amount of $249,166.00 is denied.

---

[8] In other words, if Urban claims it was entitled to $1,249,166.00, and Minskoff demanded that amount be reduced by $249,166.00, one would expect any "settlement" to fall somewhere in between $877,536.00 - accounting for 100% of the claimed backcharges - and $1,249,166.00. Instead, Urban appears to have settled this claim for substantially less than that amount.

**CONCLUSION**

For the reasons set forth above, the Court grants in part Underpinning's motion for partial summary judgment, disallowing Travelers' set-offs for (1) extended field overhead purportedly incurred during the week of June 14 to 21, 2006, in the amount of $38,199.78; and (2) additional foundation work costs in the amount of $126,000.00. The Court denies Underpinning's motion to disallow the HRH backcharges in the amount of $249,166.00. Accordingly, Underpinning is entitled to at least the sum of $184,488.78, plus prejudgment interest, against Travelers.[9]

So Ordered.

THEODORE H. KATZ
UNITED STATES MAGISTRATE JUDGE

Dated: July 23, 2010
       New York, New York

---

[9] The Court has attached, as Exhibit A, a chart to clarify what it understands to be the parties' remaining claims.

34

# EXHIBIT A

**Underpinning's Claim Under the Payment Bond**

| | |
|---|---|
| Amount Urban Agreed to Pay for the Subcontract and Five Items of Extra Work | $3,411,450.00 |
| Amount Urban Actually Paid | $2,294,000.00 |
| Outstanding Amount | $1,117,050.00 |

**Travelers' Claimed Set-Offs**

| Set-Off Category | Amount Claimed | Withdrawn by Travelers | Disallowed in the Instant Motion | To be Presented at Trial |
|---|---|---|---|---|
| Extended Field Overhead | $601,100.00 | - | $38,199.78 | $562,900.22 |
| Additional Foundation Work | $232,000.00 | $55,000.00 | $126,000.00 | $51,000.00 |
| HRH Backcharges | $318,661.00 | - | - | $318,661.00 |
| **TOTAL:** | **$1,151,761.00** | **$55,000.00** | **$164,199.78** | **$932,561.22** |

**Outstanding Amount:**                         $1,117,050.00

**Total Set-offs to be Presented at Trial:**    $932,561.22

**Underpinning's Minimum Recovery:**        $184,488.78